## STEIN vs. BURDEN.

1. A legislative grant to an incorporated company, conferring upon them " the exclusive right and privilege of conducting and bringing water for the supply of the city for the term of forty years," gives them no right to divert the water of a running stream, to the injury of riparian proprietors, without making compensation.

2. An act authorizing the lessee of certain city water works to sue out a writ of *ad quod damnum*, to ascertain the damage sustained by riparian proprietors from his diversion of the water of a running stream, does not deprive a riparian proprietor of his common law action for damages, on the lessee's failure to sue out the writ.

3. A municipal corporation, owning lands on a water course from three to five miles distant from the city, has no right to divert the water from the stream, to the injury of the other riparian proprietors, in sufficient quantities to supply the domestic wants of its inhabitants.

4. A witness who is well acquainted with the mill business, cannot give his opinion as to the damage sustained by plaintiff by a diversion of the water from his mill, when he is not informed of the size of the stream, its supply of water, or the quantity diverted.

5. No recovery can be had, except by a new action, for damages accruing subsequent to the commencement of the suit; but evidence is admissible to show the effect after suit brought of a diversion of the water, with the view of affording information to the jury of the effect of the diversion under similar circumstances before suit brought.

6. Actual possession under claim of title is sufficient to sustain an action on the case for diverting water from a mill ; and therefore evidence showing that plaintiff had no title to the land on which the mill was situated, is inadmissible.

7. A riparian proprietor is entitled to nominal damages for a diversion of the water from his mill, without any proof of actual damage.

8. The uniform and uninterrupted diversion of water from a running stream for a period of twenty years, gives a title by prescription : it is not necessary that the water should be used in precisely the same manner, or applied in the same way ; but no change is allowed which would be injurious to those whose interests are involved.

ERROR to the Circuit Court of Mobile.

Tried before the Hon. LYMAN GIBBONS.

ACTION ON THE CASE by John Burden against Albert Stein, to recover damages for defendant's alleged diversion of the water of the Three Mile Creek from plaintiff's mill. On the trial, the plaintiff proved possession under a claim of title to a tract of land on each side of the creek opposite to each other ; that in 1849 he had erected a mill on the tract on the north side of the creek ; that the defendant had diverted the water above the point where the mill was located ; that in 1837 one Jacob Page, who then owned the land, had built a mill on the same site. One of the witnesses examined on the part of the plaintiff, to prove the amount of the damage, " stated that he had owned two mills, and was well acquainted with them, and that, in his opinion, plaintiff was very greatly damaged" by the diversion of the water. The defendant objected to the admission of this evidence ; but his objection was overruled, and he excepted.

" The plaintiff also offered evidence tending to show that, at divers times since the commencement of the suit, his mill was compelled to stop grinding for the want of water, and that this was attributable, in part, to the aforesaid diversion of the water by the defendant ; which evidence the defendant objected to, upon the ground that it related to matters and facts since the commencement of the suit." The objection was overruled, and the defendant excepted. " The plaintiff also offered evidence tending to show that, at a dry season, in a. very low stage of water, long since the commencement of the suit, the defendant then diverted, by the means aforesaid, about one third or one half of the quantity of water then in the creek ; to which evidence the defendant objected ; but his objection was overruled, and he excepted." The plaintiff also offered in evidence a deposition taken in his behalf on the 7th June, 1852, a portion of which is as follows : " In consequence of the scarcity of water, the wheat rock does not run at all; the corn rock, for the same reason, cannot be run more than one third of the time." The defendant objected to this part of the deposition; but his objected was overruled, and he excepted.

The defendant claimed a right to divert the water, under the

act of December 20, 1820, incorporating the Mobile Aqueduct Company (Toulmin's Dig. 793); the act of December 24, 1821, (Pamphlet Acts, p. 76); the act to incorporate the Mobile Aqueduct Company, approved December 25, 1837; the act of January 7, 1841 (Pamphlet Acts, 1840, p. 53); and the act of December 25, 1841, (Pamphlet Acts, 1841, p. 5); and also under articles of agreement between himself and the Mayor and Aldermen of Mobile, making him lessee of the City Water Works. He also offered evidence tending to show, " that he and those under whom he claimed had diverted the water of said creek, in the manner and to the extent of his diversion, for more than twenty years next before the commencement of this suit; but that prescription, if any, did not begin before the year 1828; and that such and said diversions of said water, during the whole of said period, had been open, notorious, continued, adverse, and without interruption; and, further, that said portion of said water, during said period, had been diverted for the culinary and domestic purposes of the city, and had been so used by said city and its inhabitants in reasonable quantity."

The defendant also proved that the corporation of the city of Mobile was the owner of lands on said creek, above the point where plaintiff's mill was located; and that he owned lands on said creek at the point where the water was diverted, adjoining the lands of said corporation. He also offered to show that plaintiff was not the owner of the lands to which he had shown a *prima facie* title, and on which his mill was located, but that they belonged to the heirs of Joseph Chastang, deceased, who had commenced a suit against him for their recovery; but this evidence was excluded by the court, on plaintiff's motion, and defendant excepted.

The defendant, amongst other charges, requested the following:

1. That, if the acts of the Legislature, under which defendant claimed the right to divert the water, were wise sanitary regulations, necessary for the health and safety of the city of Mobile; and if the defendant, in diverting the water, took to the city, for its use, only so much as was necessary and proper for the accomplishment of that object, doing thereby no unnecessary damage to the plaintiff, then no recovery could be had,

although plaintiff had received no compensation for the injury which he had sustained.

2. That to render the defendant liable to damages, he must have exceeded the powers conferred by the statute creating and establishing the City Water Works.

3. That the statutes enabling the defendant to effect a great and beneficial public object, should be liberally construed in his favor ; and that, therefore, he was not liable for any consequential damage resulting from the acts done within the terms of the statute under which he acted.

4. That the Legislature having granted to the Mobile Aqueduct Company, in 1820, the right to use the waters of the Three Mile Creek to supply the city with water, and the plaintiff having acquired title to his lands after the grant of such exclusive privileges, he was bound thereby.

5. That the acts under which the defendant claimed, conferred on him a right to take the water for the supply of the city of Mobile.

6. That, if the possession of the City Water Works had been with the city authorities, and those claiming under them, for twenty years prior to the commencement of the action, a grant of the use of the water must be presumed.

7. That by the act of 1820, and the subsequent legislation on the subject of the City Water Works, the defendant was authorized to take the water from the Three Mile Creek.

The court refused all of these charges except the second, which was given with this qualification : that the statute referred to did not authorize the commission of an injury to any private individual. The court charged, in substance :

1. That the possession of the lands by the plaintiff, under a claim of title, constituted him a riparian proprietor, and gave him the right to maintain his action for damages against any one who unlawfully diverted any portion of the water from the creek.

2. That the several statutes on which defendant relied were constitutional, but they did not authorize the diversion of any portion of the water of said creek for the purposes specified in said acts, without making compensation therefor to the riparian proprietors ; and that if defendant diverted any portion of the water, at any point above the lands of which plaintiff was pos-

sessed, and took and applied the same to the culinary and domestic purposes of the city of Mobile, he was liable for at least nominal damages; and if the plaintiff sustained any special damage in the operation of his mill, he was entitled to recover to the extent of the injury sustained:

3. That the fact that the corporation owned land on the creek, did not authorize the city to bring into its corporate limits any portion of the water, to be therein consumed for culinary and domestic purposes; and that the defendant, as the agent of the city or lessee of the City Water Works, had no right to divert and convey to the city any portion of the water for its domestic use.

4. That the defendant cannot set up in defence to this action a prescriptive right to the use of any portion of the water of said creek, unless his adverse possession and enjoyment thereof had continued for twenty years next before the passage of the statute of limitations of February 7, 1843.

5. That notwithstanding the articles of agreement and the several statutes in evidence, the common law remedy of an action on the case still remains to plaintiff, and he is entitled to maintain the same against the defendant, for any diversion of the water for the purposes specified in said acts, although a mode is thereby provided for the assessment of damages.

The rulings of the court upon the evidence, the charges given, and the refusal to charge as requested, are now assigned for error.

F. S. Blount, Wm. M. Brooks and C. W. Rapier, for plaintiff in error:

Can Burden recover damages from Stein for his diversion of the water from the Three Mile Creek under the authority granted to him by the Legislature? The consideration of this question involves an inquiry into the rights of sovereignty of the State. That the State assumed the right of eminent domain over the navigable rivers and water courses within its limits, and the right to legislate thereon, is manifest from the acts passed on these subjects in 1820.—Toulmin's Digest, p. 702 to 717. It is obvious from the act of December 20, 1820, that the Legislature regarded the waters of the Three Mile Creek as a part of the public domain, because they made no provis-

ion for the riparian proprietors who might be injured by the diversion of the water granted to the Aqueduct Company; nor does the law provide for compensation to the owners of lands through which the ditch or canal is to be dug. Running water, independent of any legislation on the subject, being of the eminent domain of the State, the right of it is vested in the Legislature. The legislative grant, without compensation, was the exercise of sovereignty over the water running in the creek. The soil was in the owner of the freehold. He has no property in the water itself, but a simple usufruct while it passes along. 3 Kent's Com. 439. This being the property of the public in common for the use of all, the State, by virtue of its sovereignty, may dispose of the use for public purposes, without interfering with the title to the soil. This is emphatically a health law, and is so declared in its preamble. The principle is based on the maxim, " *Salus populi suprema est lex :*" it is applied to cases where the rights of the community require that absolute rights of individuals should be sacrificed, without compensation, if necessary to the end to be obtained. The abatement of public nuisances,—the destruction of private buildings to stop the ravages of fire,—quarantine laws, and others of a similar nature, all may be referred to this class ; in all such cases, private property is taken without compensation, nor would a claim for compensation be entertained by the courts.—5 Howard's U. S. R. 558, 559. The principle is sustained upon the well known doctrine, derivable from the maxim above quoted, that, in entering into social government, each individual tacitly consents to be deprived of a portion of his absolute rights, whenever necessary to the security, happiness, welfare and prosperity of the mass. " A familar instance of the exercise of this power," says Ruffin, C. J., " is the levying of revenue, by taking from the citizen, from time to time, such portion of his property as may be requisite to conduct the government."—Railroad Co. v. Davis, 2 Dev. & Bat. 456. " It is by virtue of this power a State legislates ; and its authority to make regulations of commerce, is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution."—C. J. Taney, in 5 Howard's U. S. R. 582, 583.

Is Mr. Stein liable for damages while acting under the authority of a law intended for the preservation of the public health,

and not exceeding the powers conferred on him ? In no case can a person be liable to an action as for a tort, for an act which he is authorized by law to do.—Callender v. Marsh, 1 Pick. 434. " This not being a direct invasion of private property, but remote and consequential merely, and arising from a public improvement, the injury is one to which individuals must submit, as the price of the social compact; and in the eye of the law the injury is *damnum absque injuria*."—Lansing v. Smith, 8 Cowen 146. In the case of Meredith v. Plate Glass Co., 4 Term R. 794, Lord Kenyon says : " If this action could be maintained, every turnpike act, paving act, and navigation act, would give rise to an infinity of actions. If the Legislature think it necessary, as they do in many cases, they enable the commissioners to award satisfaction to the individuals who happen to suffer ; but if there be no such power, the parties are without remedy, provided the commissioners do not exceed their jurisdiction." See, also, on this point, Boulton v. Crowther, 9 E. C. L. R. 227 ; Hollister v. The Union Canal Co., 9 Conn. 436 ; 7 Johns. Ch. 344 ; 11 Mass. 365 ; 4 Wend. 648.

If necessary to sustain the validity of the act incorporating the Aqueduct Company, and withholding compensation to parties supposing themselves aggrieved by the taking of private property for public uses, it may be fully sustained by referring it to the power, inherent in State sovereignty, to make police laws. The definition of this power is furnished by the Supreme Court of the United States, in the case of New York v. Miln, 11 Peters 104.

The act is not unconstitutional for want of a provision making compensation for private property taken for public uses. This was not private property at the date of the act : the United States were the owners of all the lands below the water works on the creek, including Burden's, at the time of the grant to the Aqueduct Company. If the grant was in derogation of their rights, our constitution does not provide compensation : its provision is limited to persons, not sovereignties.—Const. Ala. Art. I, § 13. Like all the restrictions laid on the exercise of sovereign authority, it was intended for the security of the citizen. The purchaser from the United States acquired the same rights that the United States had ; and this court has defined them to be no other or greater than when the grant is to an

individual.—Hendricks v. Johnston, 6 Peters. There being no constitutional restriction in favor of the United States, against the exercise of the right of eminent domain by the State, in appropriating the waters of the Three Mile Creek without compensation, the defendant in error cannot claim such compensation.

The authority to divert this water was granted in 1820 ; and conceding that Burden's vendor obtained his title in 1829, and conveyed the same to him in 1849, yet, previous to that time, the title was in the United States, and there were no private rights in existence to be violated. At all events, there is no evidence that any parties, claiming an interest in the waters of the creek, have for thirty years made any claim for compensation.

The bill of exceptions shows, that the defendant proved on the trial, that for more than twenty years next before the commencement of this suit, (but that prescription, if any, did not begin before the year 1828,) and that said and such diversions of said water had, during the whole of said period, "been open, notorious, continued, adverse, and without interruption." And upon this testimony the court charged, "that the defendant cannot successfully set up, in defence of this action, a prescriptive right to the use of any part of the waters of said creek, unless his adverse possession and enjoyment thereof had continued for twenty years next before the passage of our statute of limitations of February 7, 1843." The presumption of an easement or private right, after the expiration of twenty years, is merely in analogy to the statute of limitations, and not by virtue of it : it is wholly independent of statutory enactment ; it only arises in the absence of opposing testimony. In this case, it is not within the limits of the statute of limitations, and is wholly unaffected by the period of their enactment or repeal. Ricard v. Williams, 7 Wheaton 59 ; 2 Phil. Ev., C. & H. Notes, 380 to 384.

The case cannot be considered as presenting a question as to the taking of "any person's property," at the date of the grant of the franchise ; and, if so, no title subsequently obtained can affect the grant or contract then made : rights acquired after the grant are taken in reference and subjection thereto. The lapse of thirty years from the date of the grant,

without question or interruption, presupposes that there were no persons to claim compensation, or, if there were, creates the presumption of abandonment; in either case, the right has become perfect.

Conceding, for the sake of the argument, that the defendant was a riparian proprietor at the date of the grant, the question would arise under the act of 1820, Is this a taking of private property? The word " taking," as used in the constitution, means taking altogether, not consequential injury to it, which is no taking at all. For compensation for the latter, the citizen must depend on the forecast and justice of the Legislature.— Commonwealth v. Fisher et al., 1 Penn's Pa. R. 467 ; 1 Watts & S. 346 ; 7 Barr 348; 7 Cowen 349; ib. 585; ib. 604; 9 Conn. 436.

Conceding, further, that Burden is entitled to compensation, he must resort to the mode prescribed in the statute for obtaining it.—12 Mass. 466; 11 ib. 364; 5 Cushing 537; 2 D. & E. 434; 2 Porter 296.

But if the act is held unconstitutional, yet the evidence shows a perfect title by prescription.—3 Kent's Com. 541 to 543 ; 2 Phil. Ev. 380 ; 4 Mason 397.

Every riparian proprietor is entitled to the reasonable use of the water for culinary and domestic purposes; and if one is thereby injured, no action lies : he is without remedy.—8 Mass. 135 ; 3 Pick. 271 ; 12 Wend. 332 ; 15 Johns. 218. The city of Mobile, being a riparian proprietor, is entitled to the same use of the water as any other proprietor ; and Stein, being the lessee of the city, succeeds to all its rights and privileges. It is not necessary that the proprietor should occupy his lands on the bank of the stream: he may reside one hundred yards or eight miles distant, as he chooses, and use the water by means of aqueducts.

Burden did not show sufficient title to maintain his action : no one but a proprietor can maintain an action for diverting the water from a creek ; and a proprietor is one who has the " dominion of a thing, and the right to enjoy and do with it as he pleases, even to spoil or destroy it."—Bouv. Law Dict. 212.

The court below erred in permitting a witness to testify that, " in his opinion, the plaintiff was very greatly damaged:" he should have stated the facts on which his opinion was founded.

P. & M. Bank v. Borland, 5 Ala. 531; M. & W. P. Railroad Co. v. Varner, 19 Ala. 185.

The evidence of the condition of the stream, and of the injury done to the mill, after the suit was brought, was inadmissible; it did not throw any light on the condition of affairs before the commencement of the suit, and could only tend to mislead the jury; especially so, when the fact is borne in mind, that the stages of water in the creek were different at different times, according as the season was wet or dry.

P. PHILLIPS, *contra* :

Burden's title to the *locus in quo* was derived from an ancient Spanish grant, which was confirmed by act of Congress in 1829, and a patent certificate issued thereon to " the heirs of Joseph Chastang." Victor Gannard, who had intermarried with one of Chastang's heirs, joined his wife in a conveyance of the land to Owen & Lipscomb, in 1834, who conveyed to Jacob Page on the 1st April, 1835. Page executed a mortgage to the Bank in 1837, under which a decree of foreclosure was obtained; and at the sale Burden became the purchaser, and received the master's deed, on the 8th March, 1849. The title to the land on the south side of the creek Burden derived from a patent direct to him in 1847. The evidence showed that possession had accompanied the conveyances referred to, and was held in conformity therewith; that Page, while the owner, some time in 1837, had erected a mill on the present site, which Burden had torn down after his purchase, and buit a new one in July, 1849. No attempt has been made to question this title, and but a very feeble effort to show that Burden is not fully authorized to represent it.

Under this state of facts, what are Burden's rights as a riparian proprietor? It is well settled, that each proprietor, bounded by a water course not navigable, has a right to the use of the water in its natural flow; each may retain it, as it passes through his lands, but cannot divert it. This right is corporeal, —is an incident to the land, and passes with it as a part of the inheritance.—Hendricks v. Johnson, 6 Porter 497; 10 Barb. 518 ; Clay's Digest 595. The proprietor is entitled to the whole momentum of the fall; any diversion of the water, however small, abstracts a portion of his rights; and for this he may

maintain an action, without proving any special or appreciable damage.—Parker v. Griswold, 17 Conn. 288 ; 7 Watts & Serg. 9 ; Blanchard v. Baker, 8 Greenl. 253.

It is not denied that Stein diverts a large quantity of water, which would otherwise flow to the plaintiff's mill ; and the next inquiry, therefore, is, whether he has shown any justification of an act, which, under the ordinary rules, would constitute him a trespasser.   To simplify the case, it may be admitted that he occupies the same position as the original corporators of the Mobile Aqueduct Company.   The act of incorporation (Toul min's Digest, page 793) nowhere purports to grant the water, or the right to use the water.   The water privilege is frequently the most valuable portion of a riparian possession ; and if it were admitted that the State had the right, in the exercise of its sovereign power, to take it from the owner, and transfer it to another, without compensation, the court would not act upon slight implications and ingenious constructions, but would require clear and positive words to that effect.—Broom's Leg. Max. 4; 12 Mees. & W. 540.   There is, however, no ground upon which to predicate such a construction of the act upon implication.   The expression " authorized and empowered" confers, and was intended to confer, no other right than to do the act in a *corporate* capacity ; this corporate right was petitioned for, and was granted.   In the frequent acts incorporating railroad companies such a right is usually granted ; the company is authorized and empowered to construct a road from one point to another ; but this does not convey a right to the land over which the road passes.   So, in this case, the right to convey did not carry with it a right to the thing conveyed.   Having granted to the company, in its corporate capacity, the right to conduct the water to the city for forty years, it was left to make its own terms for the purchase of the water.   If the Legislature intended to take away so valuable a right as this, it is but justice to them to presume that they would have provided some compensation ; and the second section of the act, requiring compensation to be made to the owners of the land through which the canal passes, shows that they are not unmindful of private rights.   The fact, too, that the act of 1841 provides a mode by which damages might be assessed for Stein's diversion of the water, (an act wholly inconsistent with the idea that the

right to the water had been granted without compensation by the previous act,) is an additional argument in favor of this construction.

The second section of the act of 1820 contains this stipulation : "*provided*, that the corporation shall, before the expiration of three years from the passage of the act, cause the said water to be conducted into the said city," &c. If, then, the act was a grant of the water, this proviso expresses a condition, the performance of which could alone entitle the corporators to the rights and privileges of their charter.—Crabb on Real Property, p. 801, § 2140 a ; Dyer 311 ; 21 Ala. R. 88. The defendant admits that this condition has not been complied with, yet insists that no one but the State can take advantage of it. But the condition is clearly precedent; and not having been performed, no corporate right ever vested in the company, and it has no standing in court to enforce such right.

If, however, the act could be construed as granting the right to this water, without compensation, for great public benefit, it would be unconstitutional and void, and would afford no protection to the defendant against this action. Our bill of rights declares, that " property shall not be taken or applied to public use, unless just compensation be made therefor."—Const. Ala. Art. I, § 13 ; Code Napoleon, Art. 545 ; 2 S. & P. 217 ; 2 Johns. Ch. 162 ; Lyon v. Jerome, 26 Wend. 493 ; Bloodgood v. Railroad Co., 18 Wend. 75 ; Smith v. Helmes, 7 Barb. 426 ; Thatcher v. Dartmouth, 18 Pick. 503 ; Baker v. Boston, 12 Pick. 94 ; Perry v. Wilson, 7 Mass. 365. And Chancellor Kent says, the better opinion is, that the offer of compensation must precede or be concurrent with the seizure and entry upon private property under authority of the State.—Kent's Com., 2 vol., p. 339.

It is again contended, that Burden's right commenced only with his purchase in 1849, or, at most, related back to the date of Page's mortgage and purchase in 1837 ; and that, as the right to grant the water was exercised by the State prior to that time, he purchased *cum onere*, and is not in a situation to complain. This is not true; Burden holds all the right which was vested in Chastang's heirs under the Spanish grant in 1794. That this was not confirmed by Congress until 1829, is of no consequence to the argument ; as between the holders of

the title and the United States, it may have been treated as an imperfect or inchoate title; but as between them and any other persons, the title was perfect, and could not be invaded. The United States was owner of the vacant lands in this Territory, and this ownership was confirmed by an ordinance irrevocable at the adoption of the State constitution. In the the acquisition of that portion of the Territory south of latitude 31°, the Government became bound to perfect such titles as had a *bona fide* incipiency under the preceding dominion; and when such action takes place, the title by relation is made perfect *ab initio*. But suppose that the title to the *locus in quo* had vested exclusively in the United States when the act of 1820 was passed. It would then hold this proprietary interest in the same manner that an individual holds similar property. It exercised no political jurisdiction in virtue of the possession, nor any governmental junctions; these belonged to the State exclusively, while the lands themselves, with all the rights of property attached, belonged to the United States. The defendant, therefore, gains nothing, if he succeeds in showing that the lands belonged to the United States when the State made the alleged grant. The State cannot be justified in seizing on the running water of a stream, (which is regarded as part and parcel of the freehold,) whether it belongs to the United States or to an individual; the State can pass no act the effect of which would be to deteriorate the value of the public lands.—Bullock v. Wilson, 2 Porter 250. The right of "eminent domain" can only be exercised by the State upon making just compensation; and this right of the State is not enlarged by the peculiar character of the subject now in controversy. In this country, small streams which are not boatable, that is, cannot, in their natural state, be used for the carriage of boats, rafts and other property, are wholly and absolutely private, not subject to the public interest. —See the authorities cited in Angell on Water Courses, § 539. Nor can the Legislature, by an act, declare a river to be navigable which is not so, and thus deprive the riparian proprietors of their right to use the water for hydraulic and other purposes, without making compensation.—Walker v. Board, 16 Ohio 540; Angell on W. C. § 541; 6 Shep. R. 438; 17 Johns. 213.

Failing to justify under the statute, the defendant sets up a title by prescription; but the facts shown by the record fail to

make out such a title. I. To constitute a title by prescription, there must have been an adverse enjoyment or user, for the length of time limited by the statute of limitations for the right of entry on lands. The right to the use of flowing water is not founded in mere user, but is inherent in the land.—Campbell v. Smith, 3 Halst. 139 ; 4 Rand. 64 ; 3 Phil. Ev., C. & H. Notes, 381 ; Angell §§ 134, 308. II. The use must be uniform. To take water for a period from one point of a creek, through a pipe of three inch diameter, does not justify a taking at a different point, through an eight inch pipe ; nor can these be connected so as to make out the term required by the statute. —Arnold v. Foote, 12 Wend. 332 ; 13 Metcalf 429 ; 3 Phil. Ev. 382. III. Prescription cannot be set up against the United States, nor against its grantee until the legal title was vested in him.—Kennedy v. Townsley, 16 Ala. R. 249. The bill of exceptions shows, that it was *proved* that Stein first took the water from the present point of the creek in 1841-2, and that "the old Aqueduct Company commenced their operations subsequent" to 1828, and drew the water from a savanna on the north side of the creek. As the suit was commenced in 1850, the evidence afforded no ground to sustain a title by prescription; and if the charge of the court on this point was erroneous, this court would not reverse the judgment, the charge being abstract.

The defendant further insists, that, having acted under the sanction of the act, he cannot now be considered a trespasser, even if the act is pronounced unconstitutional. This doctrine is admitted to be true in cases of consequential damage, but not where it is direct.—1 Pick. 434 ; 8 Cowen 146.

Again ; it is said that resort must be had to the mode of compensation pointed out in the act of 1841, and that a common law action does not lie. The act of 1841 authorizes Stein "to apply for a writ of *ad quod damnum*," but does not provide a remedy for the persons suffering the damage ; it seems to have been intended for Stein's convenience only. Being in derogation of the common law, the act must be strictly construed. Even where an act points out a remedy, this does not repeal the common law remedy, unless the construction shows that to have been the intention. But the remedy which Burden has pursued is specially conferred by an act passed in December, 1820, (a few days prior to the act incorporating the Aqueduct

Company,) which gives an action against any person who obstructs or diverts any stream of water from its natural channel, in favor of the person thereby injured.

The opinion of the witness, "that plaintiff was greatly damaged," was competent evidence. He gave facts upon which this opinion was founded, and was himself a mill-owner, and well versed in such matters.—13 Metcalf 291; 1 Green. Ev., p. 488, § 440. So, too, the evidence as to the quantity of water which flowed in the creek, and its sufficiency for the working of plaintiff's mill, though stated by some of the witnesses from an inspection made subsequent to the bringing of the suit, was competent; they referred to natural objects, and to causes and effects which are unchanging.

GOLDTHWAITE, J.—The plaintiff in error, Stein, is the lessee of the City Water Works of Mobile, and deduces his right to divert the water of the Three Mile Creek, from the act of the Legislature of 20th December, 1820, (Toulmin's Digest 793,) the preamble to which recites, that it had been represented that it would be advantageous to the health and commerce of Mobile, to be supplied with water from some of the running streams in its vicinity, and that certain persons had agreed to associate themselves together for the purpose of conducting a supply of water from the Three Mile Creek.

The first section incorporates these persons and their assigns, and confers upon the company the usual powers incident to corporations.

The second section gives the company authority to cut a canal, to contain the logs which were to serve as conduits for the water, and to enter upon the lands through which the canal passed, for the purposes of construction and repair; and provides compensation to the owners of such lands for the injuries which they might sustain.

The third section gives to the company the exclusive right of conducting the water to the city, for a term of years, on certain conditions, one of which is, that the canal shall not be carried through any person's land without the consent of the owner.

The other sections regulate the water rates to be charged by the company, and prescribe penalties for injuring the logs in which the water is conveyed, cutting the hydrants, obstruct-

ing the creek above the water works, and using the water in the city without paying for it.

By the act of 1841, all the rights, privileges and immunities granted under the act of 1820, are vested in the plaintiff in error, (Pamphlet Laws 1841, p. 52,) and by the act of 1841 he is authorized to sue out writs of *ad quod damnum*, to ascertain what damages may be sustained by the proprietors of lands on the Three Mile Creek, in consequence of the withdrawal of the water or otherwise.—Pamp. Acts 1841, p. 5.

The first and most material question involved in this case, is, whether the act of 1820 confers upon the company any right to the use of the water in the creek. It does not give this right in express terms, and, if it exists at all, it can only be by implication. One of the probable consequences of using the water for the supply of a corporation like the City of Mobile, would be to impair the rights of the riparian owners below the point where the water was diverted, and, in a greater or less degree, to diminish the value of their property. A just respect for private rights demands that legislative grants should not be so construed as to affect individual property, unless the construction can be sustained upon the express words of the act, or is clearly deducible from it. It would hardly, we apprehend, be contended, that a statute incorporating a company for the purpose of erecting a public hospital, upon lands belonging either to the General Government or an individual, would have the effect of passing the title of the land to the corporation; or, as in the case put by the counsel for the defendant in error, that the right to construct a railroad between two points, would give the right of way, any more than it would the right to use the materials for its construction found along the route. So, if the Legislature should authorize a public improvement by means of a canal, and the construction of the work would destroy or impair the value of private property, without affording the means of indemnification, the owner of the property destroyed or injured would have his action at law against those who caused the damage.—Stevens v. Proprietors of Middlesex Canal, 12 Mass. 466. In the present case, there is nothing in the statute from which the intention of the Legislature to give the use of the water can legitimately be inferred; and the care with which they have guarded the rights of others, in requiring

the consent of the owners of the land through which the canal passed to be given, and providing compensation for the injury which they might sustain, is, at least, persuasive to show that the Legislature intended to grant no right which might be detrimental to others. The right to the use of the water intended to be used by the company, under certain conditions and limitations belonged to the owners of the land through which it run. It is this right which is frequently the most valuable portion of the freehold, and is, in some senses, as much identified with it, as the soil of which it is composed. With the provisions intended for the protection of property which are found in the statute, in the absence of any .express provision conferring the right, or any one from which it can fairly be deduced, we must hold that the act of 1820 conferred no authority to divert the water.

The act of 1841 (Acts 1841, p. 5) recognizes the right of the riparian proprietors to compensation for any injury they may sustain by the diversion of the water, and authorizes Stein to sue out a writ of *ad quod damnum* to ascertain the damages ; but it confers this remedy upon him alone, and, if he does not pursue it, the proprietors are not deprived of their common-law action, which is, indeed, the only course they could pursue, on the failure of Stein to proceed in the mode provided for by the statute.

It is insisted, however, that the fact that the City of Mobile owned land on the creek, upon the point where the mill of the defendant in error was located, gave to that corporation the right to the use of the water in sufficient quantities to supply the domestic purposes of its inhabitants. That a riparian proprietor has the right to consume even the whole of the water of a stream, if absolutely necessary for the wants of himself and family, has received the sanction of judicial decision, (Evans v. Merriweather, 3 Scam. 496; Arnold v. Foot, 12 Wend. 330;) but if this doctrine be correct, it can have no application in the present instance, because it rests upon reasons which are wholly inapplicable to corporations, which are artificial bodies, and can have no natural wants. There are, however, other considerations which would forbid the extension of this rule to the case before us. The City of Mobile is not located upon the creek:—it is from three to five miles distant. To hold that a municipal corporation can, from the mere fact of owning land

upon a water course, acquire the right to divert the water in sufficient quantities to supply the domestic wants of its inhabitants, residing at a distance of from three to five miles, to the injury of the other proprietors, would be unreasonable in itself, and unjust to those who have an equal right to participate in the benefits of the stream.

On the trial, one of the witnesses for the plaintiff stated, that he had "owned two mills, and was well acquainted with them," and that, in his opinion, the damage sustained by the plaintiff from the diversion of the water was very great. This evidence should not have been admitted. The damage which the party had sustained depended upon the quantity of water diverted by the defendant, and whether its diversion would materially diminish the quantity necessary for the mill of the plaintiff. The fact that the witness was well acquainted with the mill business, would not inform him of the size of the creek, its supply of water, or the amount diverted. He, therefore, did not stand in a situation which would authorize him to give his opinion, as to a result which necessarily involved these questions. The objection to this testimony should have been sustained.

In relation to the evidence showing the effect of the diversion of the water, upon the mill of the plaintiff, we do not think the court erred. We concede that, in this action, no recovery could be had for damages which had accrued subsequent to the commencement of the action, as those damages would properly form the ground of a new action, and, therefore, could only be recovered in that mode.—Robinson v. Bland, 2 Burr. 1077, 1086; Langford v. Owsley, 2 Bibb 215; Hoop. 286; Blunt v. McCormick, 3 Denio 283. But we do not find from the record that this evidence was offered for the purpose of showing the damages since the bringing of the action, but simply the effect at that time of the diversion of the water, with the view of affording information to the jury of the consequences of the diversion, under similar circumstances, before the suit; and in this aspect it was properly admissible.

The evidence offered, on the part of the defendant below, to show that the plaintiff had no title to the land on which his mill was located, was properly rejected. A lessee at will, (2 Roll. Abr. 551; Sid. 847,) and a tenant at sufferance, (*Ib.*; 13 Co. 69;

1 East 245, n. a,) may maintain an action of trespass to real property; and the rules which govern the two actions are, in this respect, analogous. The actual possession, with the claim of title, having been proved, entitled the plaintiff to sue; and for that reason the evidence offered was irrelevant.

We think, also, that the charge of the court asserting the principle, that a riparian proprietor was entitled to damages for any disturbance of his right, without proof of actual damage, was correct. It is the invasion of the right which gives the action, (1 Wm. Saunders 346 b,) and the law, in the absence of any special injury, gives nominal damages, on the ground that the undisturbed enjoyment or continuation of such acts, without the consent of the owner, would ripen into evidence of a right to do them (Young v. Spencer, 10 B. & C. 145; Hobson v. Todd, 4 Term 71; Williams ,v. Esling, 4 Barr 486) ; and this doctrine applies to all cases, where the act done is of such a character that, by its repetition or continuance, it may become the foundation of an adverse right.—Bliss v. Rice, 17 Pick. 23; Parker v. Griswold, 17 Conn. 288; Webb v. Port. Man. Co., 3 Sum. 189; Crooker v. Bragg, 10 Wend. 260 ; Blanchard v. Baker, 8 Green. 253; Ripka v. Sergeant, 7 W. & S. 9 ; Hulme v. Shore, 3 Green. 116; Welton v. Martin, 7 Missouri 307.

The fourth charge was erroneous. It is the established doctrine, that the exclusive enjoyment of water, or any other easement, in a particular way, for the length of time which is the period of the statute of limitations, enjoyed without interruption, is sufficient to raise a presumption of title, as against a right in any other person, which might have been, but was not, asserted.—Bolivar Man. Co. v. Neponset Man. Co., 16 Pick. 241; State v. Wilkinson, 2 Verm. 480; Cuthbert v. Lawson, 3 McCord 194; 3 Kent's Com., 5th edition, 442.— We have held that the act of 1802, (Clay's Dig. 327 § 83,) which fixes twenty years as the limitation to the right of entry upon land, was not repealed by the act of 1843 (Clay's Dig. 329 § 93 ; Rawls v. Kennedy, 23 Ala. 240) ; and this being the case, the uniform and uninterrupted diversion of the water, for twenty years, would give to the defendant in error a title by prescription.

We do not consider it necessary to notice the argument of

the plaintiff in error upon this point, as it would amount to no more than a verbal criticism on the meaning of the word "proved," as it is used in the bill of exceptions ; and the case must be reversed for the error previously noticed.   It is sufficient to observe, that in order to acquire this right by prescription, the law requires that the mode or manner of using the water, during the period necessary to found the right upon, should not be materially varied to the prejudice of other owners.   He is not bound to use the water in precisely the same manner, or apply it in the same way ; and in this country, as in England, a change in the mode and objects of use is allowed, the only restrictions being, that the alterations made shall not be injurious to those whose interests are involved.—Cotrel v. Luttrel, 4 Co. R. 87, a ;   Saunders v. Newman, 1 B. & A. 258 ;  Hall v. Swift, 6 Scott 167 ; Darlington v. Painter, 7 Barr 473 ;  Blanchard v. Baker, 8 Green. 253 ;  Johnson v. Rand, 6 N. H. 22.

For the error we have noticed, the judgment must be reversed, and the cause remanded.